UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------X

ASTRA MEDIA GROUP, LLC,

USDS-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/28/09

Plaintiff,

**MEMORANDUM AND
ORDER**

- v -

09 Civ. 3936
(NRB)

CLEAR CHANNEL TAXI MEDIA, LLC and the
NEW YORK CITY TAXI AND LIMOUSINE
COMMISSION,

Defendants.

-------------------------------X

**NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE**

Plaintiff Astra Media Group, LLC ("Astra") brings this

suit against Clear Channel Taxi Media, LLC ("Clear

Channel") and the New York City Taxi and Limousine

Commission ("TLC" or "Commission") for both state and

federal antitrust violations, as well as for alleged

discriminatory behavior on the part of the TLC and tortious

economic behavior on the part of Clear Channel. Now before

the Court is a motion to dismiss brought by Clear Channel

and a motion for summary judgment brought by the TLC. For

the reasons set out below, we grant both motions.

1

## I. Parties

Plaintiff Astra was formed in 2001 to manufacture and sell taxicab rooftop devices nationwide and in New York City. Astra developed and patented a rooftop model called the "Taxi Sponsoring System" ("TSS") that allows for advertising on all four sides of the display, thus generating higher advertising revenue than two-sided models. Initially, Astra focused on the manufacture and sale of the TSS to other companies, who would then sell advertising for the displays and place the tops with taxi owners in the market. Eventually, as discussed below, Astra entered the business of directly placing its rooftop displays and advertising with taxicab owners.

Defendant Clear Channel is also a business focused in the placement of taxicab rooftop advertising displays with taxicab owners and the marketing and sale of the advertising space on those displays.

The TLC, also a defendant here, regulates the taxi industry, including advertising on taxicabs and the rooftop models on which the advertising appears. The Commission operates pursuant to the New York City Administrative Code,

---

[1] The facts in this section are taken from the plaintiff's complaint unless otherwise noted.

2

Title 19, Chapter 5 and has the power to make its own rules and regulations as set out in §19-503. No TLC-licensed vehicle may carry exterior advertising without a permit from the TLC. N.Y. City Admin. Code §19-525(a). The TLC authorizes such advertising only on approved taxi rooftop fixtures. Declaration of Sherryl Eluto in Support of Defendant TLC's Motion for Summary Judgment ("Eluto Dec.") ¶¶2, 3. Approvals for rooftop fixtures are issued pursuant to §2303 of the N.Y. City Charter, which authorizes the TLC to regulate safety and design standards in the taxicab market. Eluto Dec. ¶4. If the taxitop device is approved, the TLC enters into a Memorandum of Understanding ("MOU") with the taxitop device supplier. Id. The suppliers then negotiate independently with taxicab owners to place their rooftop units and advertising onto cabs in the market. Id. Each taxicab displaying advertising must obtain a $50 annual permit from the TLC in order to display the advertising, regardless of which company provides the top and advertising. Eluto Dec. ¶5; see Admin. Code § 19-525(c).

## II. Facts of the Controversy

Beginning in 2001, Astra began working with the TLC on a pilot program for the TSS, seeking approval of the model

3

for placement on taxicabs by demonstrating that the model had been tested for performance and safety in environments comparable to New York City. On September 16, 2004, Astra was granted an MOU allowing placement of its tops on cabs in New York.[2] At that time, Astra was not installing the rooftops or selling advertising. Astra instead manufactured and supplyed the rooftops to other companies, including Clear Channel. In 2005, the business relationship between Clear Channel and Astra broke down, and Astra entered the market for installation and servicing of rooftops on its own, becoming a direct competitor with Clear Channel. By letter dated July 26, 2006 the TLC confirmed Astra's approval for use of the TSS in New York City, "contingent upon... continual compliance with all TLC equipment specifications and regulation, including any future amendment of our regulations."

Though Astra's complaint implies that Astra participated in the market without substantive contact with the TLC from that point until July of 2007, see Complaint ¶¶33-36, it is clear from Astra's submissions responding to

---

[2] The parties disagree as to exactly what specifications were approved in the 2004 MOU. The TLC maintains that the approval was for a digital top, rather than the static top in use by Astra in early 2008. See Certification of Steven Newman in Opposition to Defendant the N.Y. TLC's Motion for Summary Judgment ("Newman Cert.") Exh. U. Astra argues that the static top in use in 2008 was approved by the 2004 MOU. See id. at Exh. V.

4

the TLC's summary judgment motion that communications regarding the new MOU began in late May, 2007 and continued through the summer. See Certification of Steven Newman in Opposition to Defendant the N.Y. TLC's Motion for Summary Judgment ("Newman Cert.") ¶¶22-24. In its complaint, Astra alleges that at this time, "[u]pon information and belief, Clear Channel was... privately communicating with the TLC in an effort to have the four sided rooftop banned by the TLC." However, as is clear from these submissions, TLC officials and Astra employees exchanged letters and drafts and held at least one meeting to discuss the proposed MOU over the course of the summer.[3] Thus, according to its own submissions, Astra was also privately contacting the TLC to advocate for its own position. See, e.g. Newman Cert. ¶ 24, Exhs. M, N.

On July 5, 2007, the TLC sent Astra a letter requesting that all rooftop advertisers "enter into a Memorandum of Understanding in order to have uniform approved requirements with each of the rooftop

---

[3] These contacts include: (1) the initial May 2007 phone call from Peter Schenkman, Assistant Commissioner for Safety and Emissions at the TLC, informing Astra that a new MOU would be necessary; (2) an email from Sherryl Eluto, Assistant General Counsel at the TLC, including a draft of the proposed MOU on June 22, 2007; (3) the July 5, 2007 letter from Eluto cited by Astra in its complaint; (4) a July 9, 2007 letter from Astra citing the receipt of Eluto's email on June 22, 2007 and requesting revisions to avoid negative effects on Astra's business; (5) a July 16, 2007 letter from Astra regarding other proposed changes to the agreement; and (6) a meeting between Astra's attorney and TLC officials on August 1, 2007. See Newman Cert. ¶¶22-24; Exhs. M, N.

advertisers." On August 29, 2007, the TLC informed Astra
that it was terminating the September 16, 2004 MOU,
effective at the end of the month, and that a new MOU was
thus required. Attached to that letter was the new MOU,
which read in part:

> The TLC hereby revokes all approvals of rooftop
> advertising fixtures in effect prior to August
> 31, 2007, and desires to issue new approvals
> based upon standards cited in this Agreement...
> [t]he rooftop device shall be two-sided, each
> side rectangular in shape, and display
> advertising material to the sides of the vehicle,
> and not display advertising material to the front
> and back of the vehicle.

Though at this point it was clear that Astra had not won
the battle to keep the TLC from banning the four-sided
rooftop device, subsequent lobbying did succeed in gaining
a grace period before the new MOU's requirements would be
enforced. Newman Dec. ¶26. After the TLC agreed to allow
Astra to continue using the four-sided top through August
31, 2008, Astra signed the new MOU on or about October 5,
2007.[4]

---

[4] As of this date, Clear Channel also had four-sided tops on cabs in the
market (these had been acquired from Astra in the early stages of its
time in the market prior to the break-down of their business
relationship), and both Clear Channel and Astra had entered into new
MOUs with the TLC. Eluto Dec ¶ 11; Oral Arg. p. 23. Over the course
of negotiations with the TLC during the summer of 2007, Clear Channel
had agreed to take its four-sided tops off the market by December 31,
2007, Eluto Dec. ¶ 12, Exh. E, while Astra had been given until August
31, 2008 to remove its four-sided tops, Eluto Dec. ¶15, Exh. H. Eluto
avers that the draft MOU provided to Astra on August 29, 2007 "was
identical to the MOU entered into with Clear Channel, except that Astra
was given until August 31, 2008 to display existing advertising on four

6

Astra alleges that the four-sided tops were banned and the new MOU was required because Clear Channel and the TLC had entered into a conspiracy to achieve that result, with the goal of forcing Astra out of the market.[5] Astra bases this claim on alleged "private communications" between the TLC and Clear Channel during this period that then continued into the new year.

Nowhere in Astra's papers is there a plausible allegation for why these parties might enter into such a conspiracy. The TLC maintains that it began the process of negotiating MOUs requiring two-sided tops with all taxitop providers after an internal analysis of its outstanding MOUs undertaken "as a result of having received inquiries from new companies wishing to become taxitop providers." Memorandum of Law in Support of Defendant TLC's Motion for Summary Judgment at 7, fn. 2; Eluto Dec. ¶10. According to the TLC, the new MOU was requested in an attempt to create a "uniform MOU[] with all taxitop providers." Id. Indeed the TLC asserts that "[w]hile Clear Channel and

---

sides of the taxitop" and that the specific device approved was the same device that had been approved for use by Astra on September 16, 2004. Eluto Dec ¶ 14; see also Eluto Dec. Exhs. E, H (copies of the 2007 MOUs entered into between the TLC and Clear Channel and the TLC and Astra).

[5] Astra maintains that banning the four-sided tops meant the destruction of its business model, despite the grace period during which it could have adjusted its business model, and the fact that it could have at any time used the four-sided model without displaying ads on the front and back of the display in compliance with the TLC's requirements and their currently in effect MOU.

7

Astra seem to have assumed that four-sided advertising was permitted, it was never TLC's intent to permit advertising copy on the front and back of taxitop devices."[6] Eluto Dec ¶ 16 (describing policy justifications for this determination). Additionally, as plaintiff sets out, at this time Clear Channel itself had "several hundred 4-sided digital AstraTop TSS taxitops" remaining from the period where Clear Channel was purchasing the tops from Astra. Newman Cert. ¶ 32.[7]

No specific communication between the defendants is alleged. The only even indirect allegation regarding such a communication is an email sent by Clear Channel's Vice President for Operations, Nicholas Witkowich, to taxicab owners on February 21, 2008. As laid out in the complaint, Witkowich's email stated:

> I don't know if any of you guys are aware of the following important information from the NYCTLC. "TLC sent out a letter this week stating that ASTRA currently has no authority to operate any of the tops it now has in the NYC market. The TLC issued a cease and desist letter to ASTRA giving them 21 days to remove all tops." I don't want any of our friends being issued tickets for non approved roof top advertising. If anyone finds themselves without an advertising contract and needs an advertising top to cover the holes

---

[6] Astra contests this assertion, alleging that the 2004 MOU permitted advertising on the front and back panels. There is no explicit discussion of the panels in the 2004 MOU.

[7] These tops operated through Astra's data network. In early February 2008, Clear Channel asked Astra to remove their tops from the network. Id.; Newman Cert. Exh. Q.

in the roof call me. We can always accommodate
more tops in this market.

Plaintiff argues that the email implied Witkowich's
knowledge of the TLC's intention to revoke Astra's ability
to use the four-sided tops before the decision was
communicated to Astra.[8]  In the complaint, plaintiff states:

It is apparent that… Clear Channel had private
communications with the TLC in which the TLC
agreed to ban the four sided rooftop immediately,
and in which the TLC informed Clear Channel that
the TLC was about to take that action.  With this
knowledge, and perhaps having participated in the
discussions, Nicholas Witkowich… sent the email…
to customers of Astra Media stating that he had
knowledge from the TLC that the TLC had revoked
Astra Media's authority to install and service
rooftops.

Upon learning of the email, Astra contacted the TLC,
whose Assistant General Counsel, Sherryl Eluto, said that
no action beyond the 2007 MOU had yet been taken by the
TLC, but that there "is an issue" about whether there were
rooftops in use that were outside of what had been
approved.  Several days later, on February 26, 2008, the
TLC notified Astra that they would revoke the 2007 MOU as
allowed by the agreement if Astra did not come into
compliance with the agreement's terms.  In that letter,
Eluto wrote that it had come to the TLC's attention that

---

[8] We note that, pursuant to the 2007 MOU, the ability to use the four-
sided tops had already been revoked, and that it was only the grace
period that allowed for Astra's use of the tops at the time of this
email.

the unit currently in use by Astra "is a four-sided static system, rather than an electronic unit" and that because "Astra does not have approval for this new unit... all such units must be immediately removed." Newman Cert. Exh. U; see also Eluto Dec. ¶17; Oral Arg. p. 42.[9] Astra contested this email and argued that the model in use was the same unit approved in its original MOU. Newman Cert. Exh. V. In response, Eluto requested that Astra enter into a new MOU for the static display, allowing the tops to remain in use if such an MOU was signed as long as only two sides of the display were utilized. Newman Cert. Exh. X. The new MOU shortened the period of Astra's grace period for the four-sided tops from August until April (thirty days from the signing of the agreement). Oral Arg p. 42, ln. 21-22; see Eluto Dec. ¶19.[10]

---

[9] Astra maintains that when the TLC claimed that the model in use had never been approved, Astra "could not complain now that its authority was removed, it could not even file an Article 78 proceeding." Newman Cert. ¶ 35. There is nothing in our view that would have prevented an Article 78 proceeding, however, either at that time or upon the eventual denial of a renewed request for approval of the four-sided top. As discussed below, to the extent the real issue here is whether the TLC's determination to disallow any four-sided top was made according to inappropriate procedures, an Article 78 suit, rather than this antitrust action, would have been the more appropriate vehicle.
[10] The TLC maintains that requiring the new MOU in February 2008 was simply an effort to make Astra's MOU consistent with the tops actually in use by Astra at that time (the static display models in use, as opposed to the digital display the TLC asserts was the only model approved in the original MOU). Oral Arg. p. 42; see also Newman Cert. Exh. X (email from Eluto to Astra's attorney requesting a new MOU in order to "keep the static rooftops up on the taxis"). Astra claims the new MOU was an effort to get the four-sided tops off the market immediately and that the TLC was wrongly claiming that the "Astra

10

Astra maintains that the revocation of the 2007 MOU, in conjunction with the email from Clear Channel "effectively discredited Astra Media in the market, and ruined its business.... The actions of the TLC and Clear Channel's obvious involvement signaled to the taxicab owners and the advertisers and the creditors of Astra Media that Clear Channel could arbitrarily influence the TLC to eliminate competition." Astra does not, however, cite to any particular communication with taxicab owners, advertisers, or creditors that demonstrated this understanding of the relationship between the TLC and Clear Channel.

Also during early 2008, Astra submitted a bid to Disney Theatrical for advertising on 400 taxicabs at a rate of $170 per cab per month. Clear Channel also submitted a bid, but it was "significantly less than $170 per month."[11] Astra alleges that, as a result of the low bid and the "question of whether Astra Media was permitted to operate

---

October, 2007 MOU was for the digital TSS unit operated by Clear Channel and not Astra's own AstraLite TSS taxitop." Newman Cert. ¶ 36. This dispute is not ultimately relevant to our analysis of the alleged antitrust violation, but we note that the tops Astra sold to Clear Channel were the first tops Astra had in the market immediately following the approval of the device by the 2004 MOU.

[11] Astra does not allege the amount of Clear Channel's bid or give any indication of how it became aware of the bid, but for the purpose of Clear Channel's motion to dismiss, we will assume the bid was lower than Astra's bid. We will also assume that, as Astra has pleaded, its own bid was "close to the industry standard of cost for the unit per month."

in the Relevant Market," Astra lost the contract to Clear Channel. Astra also alleges that "upon information and belief, [that] was not the only time that Clear Channel agreed to a contract to carry advertising at below its actual cost in order to prevent the business from going to Astra." However, Astra does not give any further information regarding the alleged other instances of predatory pricing.

While there are no dates, parties, or any other specific information in Astra's complaint, Astra also alleges that Clear Channel had a practice of bringing lawsuits against both taxicab owners and Astra, claiming breach of contract and seeking damages and injunctive relief. Plaintiff alleges that the "desired effect was to damage Astra Media and reduce its willingness to compete with Clear Channel in the Relevant Market." However, Astra does not reference any particular suit or taxicab driver that was subject to suit in its complaint.[12]

---

[12] In its submissions in opposition to the TLC's motion for summary judgment, Astra lists two lawsuits: Clear Channel v. Avenue M and Astra Media Group, LLC, filed September 21, 2007 in New York County Supreme Court (Index No. 603150/07) and Clear Channel v. Sufi Management and Astra Media Group, LLC, filed on March 25, 2008 in the same court (Index No. 104390-2008). Newman Cert. ¶¶ 30, 31. First, we note that these allegations are included in plaintiff's response to the TLC's summary judgment motion, and are thus not appropriate for consideration in the context of Clear Channel's motion to dismiss. Second, even if they were considered, the first was dismissed when Astra ceased media operations on April 30, 2008 and the second was

12

Finally, Astra alleges that "on numerous occasions, Clear Channel resorted to outright destruction of the property of Astra Media" in that it removed Astra rooftops from taxicabs with no notice to Astra. However, Astra makes no reference to any specific instance of any property damage.[13]

# DISCUSSION

Astra brings claims against Clear Channel and the TLC under both state and federal law. Astra's federal claims include an antitrust claim against Clear Channel for attempt to monopolize under §2 of the Sherman Act and a discrimination claim against the TLC. Astra also brings state claims based on an alleged antitrust conspiracy between the TLC and Clear Channel in violation of the Donnelly Act, as well as claims against Clear Channel for tortious interference with contract and prospective

settled soon thereafter, according to plaintiff's submission. Id. There are no other allegations regarding lawsuits by Clear Channel.
[13] It its submissions in opposition to the TLC motion for summary judgment, Astra includes a photograph of a taxicab with a four-sided taxitop device in its trunk and claims that Clear Channel sent pictures "to Astra customers of Astra's 4-sided AstraLite TSS taxitop being taken off the top and thrown in the trunk of taxis while replaced with a Clear Channel taxitop." Newman Cert. ¶20, Exh. L. There is only one photograph, however, and no explanation is provided as to how it was acquired or what it depicts. While it does display a taxicab with an A-frame top carrying a four-sided top in its trunk, there is no information provided that would lead us to believe that it had been improperly removed from a taxicab or that it was even a four-sided top owned by Astra. Id.

13

economic advantage. Astra's claims against Clear Channel are now before us on Clear Channel's motion to dismiss. The TLC claims are before us on the TLC's motion for summary judgment.[14]

## I. The federal antitrust claim against Clear Channel: Attempt to Monopolize under §2 of the Sherman Act

---

[14] Astra argues that summary judgment is inappropriate unless Astra is first given the opportunity to conduct discovery. It is certainly true that, though discovery is not required prior to a summary judgment motion, the granting of such a motion is disfavored where the party opposing the motion has not yet had an opportunity for discovery. See, e.g., Trammell v. Keane, 338 F.3d 155, 161 fn. 2 (2d Cir. 2003) (noting that "[o]nly in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery" (quoting Hellstrom v. U.S. Dep't of Veterans Affairs, 201 F.3d 94, 97 (2d Cir. 2000))). To show that discovery is warranted, a party may submit an affidavit under Fed.R.Civ.P. 56(f) demonstrating that the non-moving party is in need of discovery "to be able to present facts needed to defend the motion." Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc., 271 F.3d 374, 386 (2d Cir. 2001). Under Rule 56(f), "a party resisting summary judgment on the ground that it needs discovery in order to defeat the motion must submit an affidavit showing (1) what facts are sought to resist the motion and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 303 (2d Cir. 2003) (internal citations and quotations omitted). "[A]lthough pre-discovery summary judgment is rare, a Rule 56(f) request should be denied where additional discovery will not uncover a genuine issue of material fact." Oscar De La Renta, Ltd. v. Mulberry Thai Silks, Inc., No 08 Civ. 4341 (RJS), 2009 U.S. Dist. LEXIS 33221 at *13 (S.D.N.Y. 2009)(quoting XL Specialty Ins. Co. v. Agoglia, No. 08 Civ. 3821(GEL), 2009 WL 1227485 at *14 (S.D.N.Y. 2009)). As set out below, plaintiff's complaint does not even state a claim upon which relief can be granted for either of the claims against the TLC. To the extent that information from the summary judgment submissions is cited in this opinion, it is only as a demonstration of the much more plausible argument that the TLC acted unilaterally in banning the four-sided tops. Indeed the vast majority of such information cited is taken from plaintiff's submission in the form of Mr. Newman's Certification. Plaintiff's 56(f) affidavit has not demonstrated any factual information that could now be obtained through discovery that would reasonably lead us to alter the result of defendant's motion.

14

Astra alleges that Clear Channel has attempted to monopolize the relevant market in violation of the Sherman Act through a pattern of behavior designed to intimidate Astra's customers and investors.

## A. The Motion to Dismiss Standard

Clear Channel challenges Astra's allegations through a motion to dismiss the complaint under Fed. R. Civ. P. 12(b)(6). Accordingly, the Court must accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences in plaintiff's favor. Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007). A complaint must include "enough facts to state a claim for relief that is plausible on its face." Bell Atlantic Corp. v. Twombley, 550 U.S. 544, 570 (2007). Where a plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." Id. This pleading standard applies in "all civil actions." Ashcroft v. Iqbal, ---- U.S. ----, 129 S.Ct. 1937, 1951 (2009) (quotation omitted). Courts may consider exhibits to the complaint and documents incorporated into the complaint by reference, and "documents that are integral to the plaintiff's claims, even if not explicitly incorporated by reference, and

15

matters of which judicial notice may be taken." Police and Fire Ret. Sys. of Detroit v. Safenet, Inc., 645 F.Supp.2d 210,224 (S.D.N.Y. 2009) (citing In re Gildan Activewear, Inc. Sec. Litig., 636 F.Supp.2d 261, 268 n. 3 (S.D.N.Y. 2009)).

In Iqbal, the Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. Iqbal, 129 S.Ct. at 1951. First, the court distinguishes between factual and conclusory allegations and disregards anything conclusory, for such statements are "not entitled to the assumption of truth." Id. Second, the court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." Id. Further, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 1949.

## B. The §2 Standard and the Noerr-Pennington Doctrine

"[T]o demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power. In order to determine whether there is a

16

dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993)(internal citation omitted). Specific intent can be inferred upon proof of unlawful conduct. Northeastern Telephone Co. v. AT&T, 651 F.2d 76, 85 (2d Cir. 1981), cert. denied, 455 U.S. 943 (1982).

Plaintiff stakes its §2 claim on an alleged scheme of anticompetitive conduct perpetrated by Clear Channel, including (1) "private communications" with the TLC, (2) an instance of predatory pricing in a bid for an advertising contract, (3) sham litigations against Astra and taxicab owners for breach of contract, and (4) destruction of Astra's property.

In claims alleging anticompetitive conduct under the Sherman Act, the Supreme Court has immunized "the conduct of private individuals in seeking anticompetitive action from the government" from federal antitrust liability. City of Columbia et al. v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 379-80 (1991)(citing Eastern Railroad President Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961)). This doctrine is called the Noerr-Pennington doctrine, and it "shields from the Sherman Act a concerted

17

effort to influence public officials regardless of intent or purpose." Mine Workers v. Pennington, 381 U.S. 657, 670 (1965). The doctrine includes "concerted actions before courts and administrative agencies" including lawsuits and administrative actions. Primetime 24 Joint Venture v. Nat'l Broad. Co., 219 F.3d 92, 99 (2d Cir. 2000) (citing Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510-511 (1972); see also I.G. Second Generation Partners, L.P. v. Duane Reade, 17 A.D.3d 206, 208, 793 N.Y.S.2d 379 (1 Dep't 2005) (citing Matsushita Elec. Corp. v. Loral Corp., 974 F.Supp. 345 (S.D.N.Y. 1997)).

Because this doctrine is founded in the First Amendment's right to petition the government, it does not extend to any petition that is "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." Noerr, 365 U.S. at 144; see also Doron Precision Systems, Inc. v. FAAC, Inc., 423 F.Supp.2d 173, 192 (S.D.N.Y. 2006) (finding that "in this district, the only conduct excluded from Noerr-Pennington coverage is conduct that never genuinely intended to influence government action"). Thus where a party, rather than genuinely seeking the result for which they are advocating, is purely attempting to impose expense and delay with no expectation of success, there

18

will be no immunity from suit under the antitrust laws. See Omni Outdoor Advertising, 499 U.S. at 380; Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 496, 500, n.4 (1988). However, while liability can not be based on actions directed at achieving the resulting government action, other independent conduct is not immune. See Omni Outdoor Advertising, 499 U.S. at 384 (remanding for determination of state law claims not based on petition to government).

## 1. Conduct Immunized by the Noerr-Pennington Doctrine

### a) "Private Communications"

The bulk of Astra's complaint is devoted to alleged "private communications" between Clear Channel and the TLC. Astra claims that Clear Channel repeatedly communicated with the TLC in an effort to "effectuate a ban on the four sided top." See, e.g., Complaint, ¶42. These allegations, however, are directly within the scope of the Noerr-Pennington doctrine. Even if, as Astra alleges, Clear Channel sought to influence the TLC to ban the four-sided top with the intention of harming competition in the market and driving Astra out of business, that anticompetitive motive is of no moment in this analysis. Indeed, if anything, the argument that Clear Channel clearly had

19

something to gain by driving Astra out of the market indicates that Clear Channel's efforts in petitioning the agency were designed to effectuate the result they sought, and thus were not within the sham exception to the doctrine. Accordingly, the communications alleged by Astra are immunized from federal antitrust liability under the Noerr-Pennington doctrine.

### b) **Lawsuits filed by Clear Channel**

In its complaint, Astra alleges:

Clear Channel adopted a practice of bringing lawsuits in the New York Supreme Court against taxicab owners who contracted with Astra Media. Typically, Clear Channel would file a complaint alleging that the taxicab owner had breached a contract with Clear Channel, and that as a result of the breach, Clear Channel was entitled to an injunction enforcing specific performance of the contract. It would thereupon make an application for injunctive relief. Complaint ¶55.

Astra does not specifically allege in its complaint that the suits were baseless. Instead it insists that one of the remedies sought, injunctive relief, was "grossly improper."[15] Id. at ¶56. Even assuming that specific performance was not an appropriate remedy in that context, surely the mere fact that a plaintiff adds claims for relief that are not warranted does not remove the otherwise

---

[15] At oral argument counsel indicated that the lawsuits may have been baseless, but offered no clear demonstration that such was the case. See Oral Arg. pp. 30-31.

protected action of bringing a lawsuit from the scope of Noerr-Pennington immunity. If that were to be true, any time a plaintiff requested punitive damages, or any other remedy to which it was not entitled, the litigation could be termed a sham within the meaning of the antitrust laws. This can not be the case.

## 2. Conduct not immunized under the Noerr-Pennington Doctrine

As stated above, the Noerr-Pennington doctrine does not immunize conduct independent of a citizen petition. Astra has also alleged that Clear Channel engaged in anticompetitive pricing and the unlawful destruction of property. We take each of these allegations in turn.

### a) Predatory Pricing

To establish that pricing is predatory within the meaning of the antitrust laws, a plaintiff must show: (1) that the defendant's prices are below an appropriate measure of the defendant's costs and (2) that the defendant has a dangerous probability of recouping its investment in below cost prices. Brook Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 223-224 (1993). The Supreme Court has "rejected... the notion that above-cost prices

that are below general market levels or the costs of a firm's competitors inflict injury to competition cognizable under the antitrust laws." Id. at 223 (citing Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 340 (1990)). The Court has also held that "without [recoupment], predatory pricing produces lower aggregate prices in the market, and consumer welfare is enhanced... [and thus it is] not enough to inquire 'whether the defendant has engaged in 'unfair' or 'predatory' tactics.'" Id. at 224-25 (citing Spectrum Sports, Inc. v. McQuillan, 506 U.S. at 459 (1993)).

Astra alleges that:

> senior Clear Channel executives contacted Disney Theatrical, and offered, among other things, to carry the Disney Theatrical advertising for significantly less than [Astra's bid of] $170 per month. The $170 per month figure is close to the industry standard of cost for the unit per month, such that Clear Channel was clearly carrying this advertising at below its actual cost. Complaint ¶52.

Astra further alleges that "upon information and belief, this was not the only time that Clear Channel agreed to a contract to carry advertising at below its actual cost in order to prevent the business from going to Astra Media." Id. at ¶54. It makes no further allegations regarding predatory pricing.

22

Astra does not set out any information as to what Clear Channel actually bid for the contract or what the cost of the advertising was to Clear Channel. Instead, Astra references only its own understanding of the industry standard of cost per unit. Its statement that Clear Channel was "clearly carrying [the] advertising below cost" is conclusory, as are its allegations of other instances of predatory pricing. See e.g., Synergetics USA, Inc. v. Alcon Laboratories, Inc., 2009 WL 435299 at *4 (S.D.N.Y. 2009)(finding the "assertion that Alcon sells its light sources for 'free' or 'unreasonably low prices' and that Alcon sells its light pipes for 'free or at negative cost,' are conclusory statements inadequate to support a claim of predatory pricing"). Further, Astra makes no allegation of an ability on the part of Clear Channel to recoup any of the money it allegedly lost through the deal by raising its prices after Astra had been eliminated from the marketplace. Accordingly, Astra has not stated a claim of predatory pricing within the meaning of §2.

### b) Destruction of Property

The entirety of Astra's destruction of property claim is that, "on numerous occasions, Clear Channel resorted to outright destruction of the property of Astra Media -

23

removing the rooftops from taxicabs without the authorization of Astra Media, or even notice to Astra Media, and destroying them." Complaint ¶58. Plaintiff makes no further statements regarding where, when, or what property was destroyed.[16] Astra has clearly failed to meet the pleading standards with respect to this claim.[17]

## II. Federal claim against the TLC

Astra alleges that the TLC told them that advertising for adult entertainment was offensive and thus in violation of their MOU while other competitors continued to sell the advertising. Astra makes no reference to under what law it brings this claim, but we will assume it brings a discrimination claim based on the Equal Protection Clause

---

[16] At oral argument, when asked why Clear Channel would logically commit these acts, plaintiff's counsel expressed his understanding that Clear Channel had taken pictures and shown them to other taxicab owners as a part of a general scheme to intimidate Astra's taxi owners. Oral Arg. p. 33-34. While plaintiff makes reference to and includes one such picture in its opposition papers to the TLC motion for summary judgment, the picture only shows an unspecified taxi top in a trunk. Newman Cert. Exh. L. Allegations involving a picture or the showing of a picture to market participants appeared nowhere in plaintiff's complaint and there has been no plausible explanation for why the forcible destruction of Astra's tops, which presumably would have left holes in the taxis, would have endeared taxi owners to Clear Channel.
[17] Though not considered in the context of the motion to dismiss, we note that any role such destruction might play in a general scheme to intimidate is minimalized in plaintiff's own submission in opposition to the TLC's motion for summary judgment. There, Astra cites the alleged removal of the tops then, in the following paragraph, claims that "[d]espite these efforts to discredit and dissuade customers from doing business with Astra, Astra continued to remain sold out for advertising space and continued to receive additional investment into the company to manufacture, install 4-sided TSS taxitops on taxis and market space thereon." Newman Cert. ¶21.

24

of the U.S. Constitution.[18]  As set out above, Astra's claims against the TLC are now before us on a motion for summary judgment.

## A. The Summary Judgment Standard

Summary judgment is appropriate only if "there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc., 448 F.3d 573, 579 (2d Cir. 2006) (quoting D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)) (internal quotation marks omitted); see also Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating that no genuine factual dispute exists. Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000). All ambiguities are resolved and all inferences are drawn in favor of the nonmoving party. Beth Israel, 448 F.3d at 579. Summary judgment should not be granted unless "no rational finder of fact could find in favor of the non-moving party." Carlton, 202 F.3d at 134.

---

[18] To the extent this claim could also be brought under the New York Constitution, we note that the provisions are interpreted in parallel. Hayut v. State Univ. of N.Y., 352 F.3d 733, 754-755 (2d Cir. 2003) ("'[Article I, section 11 of the New York State Constitution] was intended to afford coverage as broad as that provided by the Fourteenth Amendment to the United States Constitution.'" (quoting Brown v. State, 89 N.Y.2d 172, 190 (1996))).

25

The mere existence, however, of an alleged factual dispute between the parties will not defeat a motion for summary judgment because "the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). In order to defeat such a motion, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for trial. Id. at 256. An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248 (internal quotation omitted); see C.R. Bard, Inc. v. Advanced Cardiovascular Systems, Inc., 911 F.2d 670, 672-73 (Fed. Cir. 1990).

To raise a genuine issue, a non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986), cert. denied, 480 U.S. 932 (1987); see also Lipton v. Nature Co., 71 F.3d 464, 469 (2d Cir. 1995). "'Mere conclusory allegations or denials' in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist." Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980) (citation omitted). Rather, the non-moving party must

produce specific facts sufficient to establish the existence of a genuine issue of fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lipton, 71 F.3d at 464. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 248 (citations omitted).

## B. **Equal Protection**

Generally, a discrimination claim founded in the Equal Protection Clause is based on unequal treatment of a member of a protected class, though there are some circumstances where a "class of one" claim may be made out. Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000). To prevail on such a claim, however, plaintiffs must "state an equal protection claim where they allege that they were intentionally treated differently from other similarly-situated individuals without any rational basis." Clubside, Inc. v. Valentin, 468 F.3d 144, 159 (2d Cir. 2006)(citing Olech, 528 U.S. at 564 (2000)).

Astra alleges that "the TLC stated to Astra Media, thru [sic] meetings and thru [sic] attorney Richard Weinberg, the acceptance of adult entertainment (strip bars) on rooftops in the Relevant Market is 'offensive to public morals' and violates the MOU of 2007" while

27

"competitors of Astra Media were and to this day are permitted to carry the very same advertising from the very same gentlemen's clubs." Complaint, ¶¶93, 94. The TLC alleges that if it had intended to convey such a message, it would have done so through the means designated in the MOU for notifying taxitop providers of violations. It is undisputed that no such official action was taken with respect to these advertisements. Astra counters that it was impossible to know which communications were "official," and that based on their previous course of dealing they were concerned due to the comments made by TLC employees.[19]

The TLC alleges that the claim fails as a matter of law because Astra can not show that TLC intentionally treated Astra differently from the other providers. We agree. Indeed plaintiff has not even pleaded anything but conclusory statements in this regard. At oral argument, Astra did not contest the TLC's assertion that there has never been a ban on the advertising and that the advertising continues to be placed on taxicab rooftop devices. Plaintiff has not stated any specific facts that would indicate a genuine issue of fact as to whether the

---

[19] Astra did not name any specific employees in its complaint, but in its opposition papers to TLC's motion for summary judgment, Astra states that the comments came from Peter Schenkman and Sherryl Eluto. See Complaint ¶93; Newman Cert. ¶49.

28

TLC singled them out intentionally, nor has it even alleged that it changed its behavior or was asked to do so by the TLC. No official action was taken, officials responded promptly when Astra made an inquiry into the issue with the Mayor's office,[20] and there was absolutely no incentive for the TLC to treat providers differently.

## III. The State Law Claims

Astra also brings several state law claims. First, Astra brings a state antitrust claim under the Donnelly Act alleging a conspiracy between the TLC and Clear Channel to reduce competition in the New York taxitop market.[21] Astra also brings state tort claims alleging that Clear Channel interfered with Astra's contracts and with Astra's prospective economic advantage. We address each of these claims below.

## A. Conspiracy allegations under the Donnelly Act

Plaintiff alleges that the defendants violated state antitrust law by conspiring to drive Astra out of the

---

[20] We note that the letter written by Astra's President to Mayor Bloomberg seeking guidance on this issue was sent in September 2008, after Astra had ceased participation in the market. Oral Arg. pp. 45-46.
[21] We note the differing procedural postures of the defendants in this analysis, given that Clear Channel now brings a motion to dismiss, while the TLC maintains a motion for summary judgment. Accordingly, we apply the relevant standard of review, discussed above, to each of the parties.

market, thereby harming competition in the relevant market. While defining the relevant market is a fact-intensive analysis, Todd v. Exxon Corp., 275 F.3d 191, 199-200 (2d Cir. 2001), for our purposes here we will assume it to be as plaintiff has set out in the complaint.[22]

The Donnelly Act provides that "[e]very contract, agreement, arrangement or combination whereby a monopoly... is or may be established or maintained, or whereby competition... may be restrained" is illegal. N.Y. Gen.Bus.Law § 340(1). The Act is modeled on the Sherman Act and "should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result." People v. Rattenni, 81 N.Y.2d 166, 171 (1993) (quoting Anheuser-Busch, Inc. v. Abrams, 71 N.Y.2d 327, 335, 525 (1988)). "A party asserting a violation of the Donnelly Act must (1) identify the relevant product market, (2) describe the nature and effects of the purported conspiracy, (3) allege how the economic impact of that conspiracy is to restrain trade in the market in question, and (4) show a conspiracy

---

[22] "Taxicab rooftop installation, servicing and advertising within the five boroughs of New York City, under the jurisdiction of the TLC..." including "contracting with owners of taxi cabs for the installation of rooftops on taxicabs, and the contracting with advertisers who advertise on the rooftops under the authority of the TLC." Complaint, ¶10.

30

or reciprocal relationship between two or more entities." Yankees Entertainment and Sports Network v. Cablevision Systems Corp., 224 F.Supp.2d 657, 678 (S.D.N.Y. 2002)(citing Great Atlantic & Pacific Tea Co., Inc. v. Town of East Hampton, 997 F.Supp. 340, 352 (E.D.N.Y. 1998)).

While, as plaintiff points out, it is generally difficult to demonstrate a conspiracy without the benefit of discovery, "conclusory allegations of conspiracy are legally insufficient to make out a violation of the Donnelly Act." Yankees Entertainment and Sports Network, 224 F.Supp.2d at 678 (finding that conclusory statements did not establish defendant's actions as anything other than unilateral)(citing Sands v. Ticketmaster-New York, Inc., 207 A.D.2d 687, 616 N.Y.S.2d 362 (1 Dep't 1994)); See also Creative Trading Company, Inc. et al. v. Larkin-Pluznick-Larking, Inc., d/b/a Nat'l Fashion & Boutique Show, et al., 148 A.D.2d 352, 355, 539 N.Y.S.2d 1 (1 Dep't 1989)(Sullivan, J., dissenting)(rejecting the pleadings because "[i]nstead of alleging facts that would tend to establish an unlawful conspiracy, they repeatedly parrot the words 'conspiracy and reciprocal relationship', without specifying the dates or places relevant to the alleged conspiracy"), rev'd for reasons in dissenting opinion, 75 N.Y.2d 830 (1990). In addition, the Donnelly Act cannot be

violated through a unilateral act. See, e.g., State of New York v. Mobil Oil Corp., 38 N.Y.2d 460, 461 (1976)(finding one-sided "systematic and deliberate" price discrimination was not a conspiracy).

Plaintiff alleges that it has pleaded the relevant market, and that the nature and effects of the alleged conspiracy were the demise of Astra and its four-sided taxitop units. As to how the economic impact of that conspiracy is to restrain trade in the market in question, Astra alleges that the MOU "eliminates competition in the design and installation of the taxitops, as well as in the advertising option[s] available to advertisers." Memorandum of Law of Plaintiff Astra Media Group, LLC, in Opposition to the Motion to Dismiss by Defendant Clear Channel Taxi Media, LLC at 14. While Astra is clearly correct that Astra's four-sided tops are no longer available as an advertising option for advertisers in the New York City market, there is no allegation as to how that has hurt the taxitop market generally aside from a uniform ability to sell slightly less advertising per taxicab. Indeed, Astra itself is still the holder of an MOU allowing it to participate in the market with a two-sided top, or even its four-sided top, as long as no advertising is displayed on the front and back panels.

The plaintiff's weakest allegation, however, pertains to the final prong of the Donnelley Act claim, which requires that a conspiracy or reciprocal relationship exist between the defendants. Astra makes three statements in its complaint that it alleges demonstrate the relationship: (1) that Astra had a patented top, which it was licensing to Clear Channel until the relationship deteriorated and Astra began competing directly in the market on its own; (2) that the TLC originally approved the four-sided top, but then banned it without hearings or studies to form the basis of the ban; and (3) that Clear Channel notified Astra's customers of the impending ban before the TLC notified Astra.

Certainly, when Astra entered the market directly, Clear Channel desired to be more successful than Astra, just as Astra sought the same with respect to Clear Channel. An environment ripe for such competitive motivation does not itself allow us to infer anticompetitive behavior though, and is indeed the very environment that the antitrust laws are designed to protect and foster. Similarly, the fact that the TLC banned the four-sided top is not alone indicative of any anticompetitive intent. Further, regardless of whether the

33

TLC ever originally approved the four-sided top,[23] the fact
that the TLC decided it was not in the public interest to
allow the device does not suggest that it did so due to a
conspiracy to drive Astra out of the market. This is
especially true given that at the time of the decision,
Clear Channel was also using the four-sided tops for some
of its advertising contracts[24] and the TLC had no economic
motivation to favor one taxitop provider over another.[25] To
the extent that Astra is contesting the means through which
the TLC made its decision, that question would have been
more properly the subject of an Article 78 proceeding,
which Astra did not pursue when the decision was made or
within the subsequent statute of limitations period.[26]

Finally, Astra's only allegations of a link between
the defendants come in the form of alleged "private
communications" between Clear Channel and the TLC to

---

[23] The TLC maintains that it never intended to approve a four-sided top.
Eluto Dec. ¶16. The TLC further maintains that the top Astra is
currently approved for is not the top they were approved for prior to
the signing of the 2008 MOU. See Oral Arg. at X; see also Newman Cert.
Exh. U; Eluto Dec ¶17; Oral Arg. at 42. Astra contests both of these
assertions.
[24] According to Astra's submissions, Clear Channel pulled its four-sided
tops out of the market in February 2008, after it agreed to sign a new
MOU with the TLC in the summer of 2007. Newman Cert. ¶32, Exh. Q
[25] The TLC has no economic incentive to lower (or increase) the number
of taxitop providers, but rather collects the same fee from all
taxicab owners regardless of who provides the rooftop device. Eluto
Dec. ¶5.
[26] See Bustop Shelters, Inc. v. Convenience & Safety Corp., 521 F.Supp.
989, fn. 10 (S.D.N.Y. 1981) (recognizing the maxim that "(t)he
antitrust laws were never meant to be a panacea for all wrongs" (citing
Parmelee Transportation Co. v. Keeshin, 292 F.2d 794, 804 (7th Cir.),
cert. denied, 368 U.S. 944 (1961)).

34

"effectuate a ban on the four sided top." Complaint ¶ 42. In that regard the only specific communication offered by Astra is an email from a Clear Channel employee to taxicab owners "stating that he had knowledge from the TLC that the TLC had revoked Astra Media's authority to install and service" its four-sided rooftops. Id. at ¶43. Plaintiff alleges that, because the TLC had not yet taken such action, the email is indicative of communications between the defendants. Yet as laid out more fully above, both parties had been in communications with the TLC and both parties were already on notice that the four-sided tops were eventually going to have to be removed from the taxicabs. Any allegations of knowledge beyond this that could be implied by the email are so conclusory and undefined that they are insufficient to establish the presence of a conspiracy, and thus fail to state a claim under the Donnelly Act.[27] Further, when pressed at oral argument, plaintiff could articulate no motive or incentive

---

[27] Further, the communications are arguably protected by the Noerr-Pennington doctrine. Though it is an open question as to whether the doctrine applies to Donnelly Act claims, defendants argue that based on the First Amendment underpinnings of the doctrine and because the Donnelly Act is generally interpreted in parallel with the Sherman Act, see Yankees Entertainment and Sports Network, 224 F.Supp.2d 657, 678-79 (S.D.N.Y. 2002), Noerr-Pennington should be interpreted as applying to Donnelly Act claims. Though we see the merit in defendants' arguments, we do not reach this issue here because it is sufficiently clear that plaintiff fails to plead a reciprocal relationship between the defendants.

35

on the part of the TLC that would make such a bare allegation of conspiracy at all plausible.

Plaintiff's Donnelly Act claim is therefore dismissed.

## B. Tortious Interference with Contract

### 1. Application of the Noerr-Pennington Doctrine

Defendants argue that the Noerr-Pennington doctrine exempts any government petition from a tortious interference claim. We agree. "Although the Noerr-[P]ennington doctrine initially arose in the antitrust field, the courts have expanded it to protect First Amendment petitioning of the government from claims brought under Federal and State law, including claims asserted pursuant to 42 USC § 1983 and common-law tortious interference with contractual relations." Alfred Weissman Real Estate, Inc. v. Big V Supermarkets, Inc., 268 A.D.2d 101, 107, 707 N.Y.S.2d 647 (2 Dep't 2000)(citing Video Intl. Production v. Warner-Amex Cable Communications, 858 F.2d 1075 (5th Cir. 1988), cert. denied 491 U.S. 906 (1989); Hamilton v. Accu-Tek, 935 F.Supp. 1307, 1317 (E.D.N.Y. 1996)); see also Bath Petroleum Storage, Inc. v. Market Hub Partners, L.P., 229 F.3d 1135 (2d Cir. 2000)(collecting cases where Noerr was applied to RICO, tortious interference, unfair competition, and §1983

actions). As in the federal application of the doctrine, the immunity extends to the filing of litigation and retains the sham exception. I.G. Second Generation Partners, L.P. v. Duane Reade, 17 A.D.3d 206, 208, 793 N.Y.S.2d 379 (1 Dep't 2005) (citing Matsushita Elec. Corp. v. Loral Corp., 974 F.Supp. 345 (S.D.N.Y. 1997); Concourse Nursing Home v. Engelstein, 278 A.D.2d 35, 717 N.Y.S.2d 154 (1 Dep't 2000)).

## 2. Clear Channel's alleged tortious interference with Astra's contracts

To prove tortious interference with contract, plaintiff must show (1) the existence of a valid contract; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach of that contract, and (4) damages. Israel v. Wood Dolson Company, Inc., 1 N.Y.2d 116, 120 (1956). Astra alleges three sets of contracts interfered with by Clear Channel, including (1) the MOUs between the TLC and Astra "prior to August 2007" and "as of February 2008," (2) "a number of valid contracts" between Astra and taxicab owners, and (3) "a number of valid contracts" between Astra and advertisers. Complaint ¶¶ 72, 73, 77, 81. However, Astra's claims regarding the MOUs

with the TLC are founded, if at all,[28] on Clear Channel's petitioning of the government.  Claims based on these contracts are thus barred by the Noerr-Pennington doctrine. In addition, the only facts alleged that could lead to a tortious interference claim with regard to the taxicab owners are the lawsuits against those parties and Astra that, as already discussed above, do not fall within the sham exception to the doctrine.  To the extent that Astra bases its allegations on other contacts between Clear Channel and the taxicab drivers, it has not alleged any such facts.  Finally, plaintiff makes no allegations regarding any contact between Clear Channel and Astra's advertisers aside from Clear Channel's alleged interference with prospective economic advantage, which will be

---

[28] While the 2004 MOU did not contain a termination clause, Section 3.1 of the 2007 MOU states: "The Chairperson may terminate this Agreement prior to the expiration date of this Agreement if the Chairperson determines, in accordance with and subject to the procedures set forth in this subsection, that this Agreement has not been substantially complied with... Astra shall have twenty-one (21) business days to cure any defect or to respond to any concerns set forth in the notice unless otherwise extended by the TLC at the request of Astra.  Should Astra fail to cure any defect or fail to respond to any concerns set forth in the Chairperson's notice to the satisfaction of the Chairperson within the time period allotted by the TLC, the Chairperson may promptly terminate this Agreement."  Eluto Dec. Exh. H.  Clear Channel argues that based on the lack of any language in the 2004 MOU stating that the contract was not terminable at will (and the lack of any suggestion by Astra that the 2004 MOU was breached), and the express termination clause in the 2007 MOU, there are no grounds for a breach of contract claim.  Defendant Clear Channel Taxi Media, LLC's Memorandum of Law in Support of its Motion to Dismiss the Complaint for Failure to State a Claim at 20.

38

discussed below. Therefore plaintiff has failed to plead a sufficient claim for tortious interference with contract.

## C. Tortious Interference with Prospective Economic Advantage

Astra alleges that Clear Channel "interfered with Astra Media's business expectancy with Disney Theatrical by bidding a price below Clear Channel's costs in order to prevent Disney Theatrical from doing business with Astra Media." Complaint ¶87.

To prove tortious interference with prospective economic advantage, plaintiff must show "1) that it had a business relationship with a third party; 2) that the defendant knew of that relationship and intentionally interfered with it; 3) that the defendant acted solely out of malice or used improper or illegal means that amounted to a crime or independent tort; and 4) that the defendant's interference caused injury to the relationship with the third party." Amaranth LLC v. J.P. Morgan Chase & Co., 888 N.Y.S.2d 489, 494 (1 Dep't 2009). No one disputes that Clear Channel sought to gain an economic advantage for itself by making its bid for the Disney contract, so in order for this claim to stand, Clear Channel must have used improper or illegal means. Indeed, "where the interference

is intended at least in part to advance the competing interest of the interferer, no unlawful restraint of trade is effected, and the means employed are not wrongful. 'Wrongful means' include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract." Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 191, 406 N.E.2d 445 (1980).

Plaintiff is correct that any conduct found to be anticompetitive within the meaning of the antitrust laws would certainly be wrongful. However, as discussed above, plaintiff has not stated a claim for which relief can be granted as to the anticompetitive nature of the low bid for the Disney contract.[29] Therefore plaintiff also fails to state a claim for which relief can be granted on this count.

## CONCLUSION

For the foregoing reasons, we grant defendant Clear Channel's motion to dismiss as well as defendant TLC's

---

[29] In this section of the complaint, Astra does refer to the price as being below Clear Channel's actual cost. However, the lack of any pleading as to what the bid or costs actually were makes this statement conclusory.

motion for summary judgment. We add for clarity that had the TLC moved to dismiss on the basis of the complaint alone, that motion would have been granted. Accordingly, the complaint is dismissed in its entirety.

**SO ORDERED.**

DATED:    New York, New York
          December 29, 2009

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE